UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

GILBANE FEDERAL F/K/A ITSI
GILBANE CO.,

          Plaintiff,

   v.

UNITED INFRASTRUCTURE PROJECTS
FZCO, et al.,

          Defendants.

Case No.  14-cv-03254-VC

**FINDINGS OF FACT AND
CONCLUSIONS OF LAW**

## I.      FINDINGS OF FACT

<u>Background</u>

1.      Gilbane Federal is a California corporation with headquarters in Walnut Creek.  Dkt.
No. 193 at 10.  Ernie Hogue was a Gilbane project manager and Brett Davis was a Gilbane
construction manager during most of the events giving rise to the parties' dispute.  Tr. at 7-8, 175.

2.      UIP FZCO ("UIP") is a foreign corporation registered and headquartered in Dubai.
Dkt. No. 193 at 10.  Mazin Sadiq was UIP's CEO and Wail Sadiq was General Manager during
most of the events giving rise to the parties' dispute.  Tr. at 328-29.

3.      UIP Lebanon is a foreign corporation registered in Lebanon and headquartered in
Beirut.  Dkt. No. 193 at 11.

4.      UIP Djibouti is a foreign corporation registered and headquartered in Djibouti.  *Id.*

5.      The United States Navy, which is not a party to this action, was responsible for
administering Gilbane's contract through Naval Facilities Engineering Command Pacific
("NAVFAC").  *Id.*  Dave Ebmeier is the former Navy employee partly responsible for creating the

Navy's project specifications. Tr. at 220-21. He retired from the Navy at the end of 2013 and went to work for Kinney Electrical Manufacturing shortly thereafter. Tr. at 219. Rick Stephens was the Navy reviewer responsible for approving submittals in connection with the Gilbane's contract with the Navy. Tr. at 246-47.

<u>The Parties' Contracts</u>

6.      Gilbane was awarded Contract No. N62470-13-C-3006 ("the Prime Contract") with the Navy on September 24, 2013. Dkt. No. 193 at 11.

7.      Under the Prime Contract, Gilbane agreed to perform electrical and mechanical work in connection with power-plant upgrades at Camp Lemonnier in Djibouti. *Id.* The completion date under the Prime Contract was December 4, 2014. Tr. at 348-49.

8.      On January 21, 2014, Gilbane entered into a subcontract with UIP ("the Subcontract") under which UIP assumed responsibility for almost all of Gilbane's duties under the Prime Contract, including providing equipment, materials, and labor, and seeing the project through to completion in "turnkey" condition. Dkt. No. 193 at 11; Tr. at 9-11. The "turnkey" systems for which UIP was responsible comprised a fuel transfer system connecting Camp Lemonnier's existing power plants, switchgear with housing, and eight new generators to provide additional power. Tr. at 9-10. Gilbane retained responsibility for hiring its own set of supervisorial staff, interfacing with the Navy, and setting and updating the overall project schedule. Trial Ex. 34 at ¶¶ 5, 11; Tr. at 425-26.

9.      The completion date under the Subcontract was December 4, 2014, the same date completion was due under the Prime Contract. Trial Ex. 34 at 2.[1] However, Gilbane also agreed to a 30-day "grace period" following the completion date during which UIP would not be responsible for liquidated damages. *Id.*; Tr. at 103-06. This grace period was inserted to account for the time it took to get the Subcontract finalized. Trial Ex. 48 at 3; Tr. at 348-49.

10.     The Subcontract set interim deadlines. Trial Ex. 34 at ¶ 6.A. The transformers were to arrive on site by April 18, 2014. The fuel system was to arrive by May 2, 2014. The switchgear

---

[1] All trial exhibit page numbers refer to the terminal digits of the exhibit's Bates number.

was to arrive by May 16, 2014. The first four generators were to arrive by July 20, 2014. Pre-final inspection was set for October 30, 2014. The turnover date was November 25, 2014.

11.     The Subcontract made reference to a "Subcontract Schedule" whose deadlines would be incorporated by reference and become terms of UIP's performance. *Id.* However, no Subcontract Schedule was attached to the Subcontract. Tr. at 107.

12.     Attachment C to the Subcontract set forth a process for making changes to the work required under the Subcontract. Trial Ex. 34 at 48. Specifically, Attachment C gave Gilbane the authority to "direct changes in the schedule, scope, quantities or any other aspect of the Subcontract Work at any time," provided Gilbane received the change directly from the Navy. *Id.* UIP then had the responsibility to submit a change notice, in a "formal written document conspicuously labeled" as such, laying out the effect of a change on the Subcontract schedule and price. *Id.* Both parties were then expected to "promptly work and cooperate together" on the issues raised by UIP's change notice. *Id.*

13.     Attachment C also set forth a process for UIP to submit a claim in the event the parties' negotiations following a change notice were unsuccessful. Trial Ex. 34 at 48-49. Specifically, UIP was required to submit a claim notice in a "formal written document conspicuously labeled" as such. *Id.* at 48. Gilbane then had 90 days to evaluate the claim's merit, at which point it had the option, if it believed the claim to be meritorious, of "sponsoring" that claim to the Navy. *Id.* at 49.

14.     The Navy's specifications and the terms and conditions of the Prime Contract were both incorporated by reference into the Subcontract. Dkt. No. 193 at 11. The Navy's specifications included a process for requesting a variation from contract requirements. Trial Ex. 215 at § 1.8.2. This process required the party seeking the variation to provide documentation explaining the nature of and reasons for the variation, as well as a submittal incorporating the variation. *Id.*; Tr. at 19-20.

15.     The Subcontract had a "single Firm Fixed Price" of $11,098,420. Trial Ex. 34 at 34.

16.     Attachment B.2 to the Subcontract required Gilbane to make payment for major

equipment purchases in two installments, with 50% of the payment due with the purchase order,

and the remaining 50% due on receipt of a notice that the equipment was ready for shipping.  Trial

Ex. 34 at 36.

17.     The Subcontract required Gilbane to make payment for major equipment purchases

by joint check.  Dkt. No. 193 at 11; Trial Ex. 34 at 36.  It's unclear from the record exactly what

these joint check payments entailed.  However, Attachment C suggests that the Subcontract

contemplated joint checks to UIP and individual equipment suppliers.  Trial Ex. 34 at 40.  The

Court finds this construction consistent with the ordinary understanding of a joint check

arrangement.  *See, e.g.*, Cal. Bus. & Prof. Code § 7164(b)(2).

Factual History

18.     Before signing the subcontract, UIP already had significant experience in federal

contracting internationally.  Based on that experience, UIP was accustomed to meeting IEC standards

in lieu of IEEE standards even when project specifications called for IEEE.[2]  However, UIP was on

notice that Navy might not treat these standards as interchangeable at least as of November 4, 2013,

when the Navy sent UIP a letter objecting to its use of IEC standards on the "LAMS" project – a

project unrelated to Camp Lemonnier.  Trial Ex. 196 at 31; Trial Ex. 668 (Dkt. No. 202-1) at 31-35;

Tr. at 274-78.  It is unclear whether this change was brought about by a single inexperienced Navy

staffer, as UIP believed at the time.  Tr. at 335.  But whatever the reason for the Navy's stricter

adherence to its own specifications in late 2013, UIP was aware – while negotiating its Subcontract

---

[2] IEC standards are set by the International Electrotechnical Commission in Geneva.  IEEE standards are set by the Institute of Electrical and Electronics Engineers in New Jersey.  No witness was able to adequately explain why IEC is not an acceptable alternative to IEEE in foreign projects, particularly where the former is available at lower cost.  Davis speculated that IEEE was preferred because it was somehow safer or better-quality, but he was unable to explain how.  Tr. at 214-15. Ebmeier, who actually drafted the Navy specifications that required IEEE, said that IEC was "loose" and less "familiar" to the Navy.  Tr. at 242-43.  There is no reason to doubt the accuracy of this testimony.  But it's unclear why any of that matters to the function, safety, or durability of a project.  It may be that there is, in fact, no significant advantage to IEEE, and no significant reason for preferring it internationally, other than the Navy's discomfort with IEC being "European."  Tr. at 215, 243.  It does not follow, however, that UIP was entitled to deviate unilaterally from the specifications it agreed to.

with Gilbane, and before signing the Subcontract – of a significant risk associated with unilaterally deviating from those specifications. UIP then neglected to seek clarification from Gilbane or from the Navy about the possibility of using IEC standards to lower its costs, and it failed to make clear whether its bid price was made on the assumption that IEC standards would be accepted.

19. When discussing the possibility of contracting with UIP, Gilbane expressed some concern about the reasons UIP's bid was substantially lower than Caterpillar's.[3] Tr. at 160-61. Although the Navy had recently eliminated a requirement that generators be purchased from Caterpillar, Gilbane had reservations about UIP's ability to find lower-cost non-Caterpillar equipment that would adequately communicate with the existing equipment at Camp Lemonnier. Trial Ex. 13; Tr. at 160-61. Mazin Sadiq, UIP's former CEO, offered four different options for overcoming potential problems in this area, one of which included completely replacing the control system. Trial Ex. 13. Sadiq stated that the cost of each of these four options was reflected in UIP's bid price, although the cost overage was not actually separately budgeted, but incorporated within a general "risk and contingency" budget. Trial Ex. 40.

20. In December 2013, UIP provided a draft schedule to Gilbane estimating its internal deadlines. Trial Ex. 25. This draft schedule was not incorporated into the Subcontract, but it was used by Gilbane when preparing a schedule for the Navy. Tr. at 20-22. According to UIP's draft schedule, submittals for switchgear equipment and generators were to be complete in time for Navy approval by January 15, 2014. Trial Ex. 25 at 9-11. This date may have reflected the parties' understanding that UIP would begin the process of preparing its submittals even before the Subcontract was signed. Or it may have reflected the parties' mistaken assumption that the Subcontract would be signed much sooner than it actually was. The Subcontract was not signed until January 21, 2014.

---

[3] UIP did not have the lowest bid price. Tr. at 169. However, the Court does not find this to be meaningful evidence that UIP's bid price accurately reflected the cost of adhering to IEEE standards. It may simply reflect that UIP wasn't the only bidder making unreasonable and undisclosed assumptions about its ability to deviate from the project specifications.

21. On February 15, 2014,[4] Wail Sadiq emailed Gilbane to explain that he had deliberately delayed submittals because he was expecting additional guidance from the Navy on a related project, and he felt the guidance from that project might be worth incorporating into the submittals for Camp Lemonnier. Trial Ex. 40; Tr. at 22-24. Wail Sadiq was referring to the "P910" project and to UIP's discussions with the Navy about using IEC standards in lieu of IEEE standards.

22. On February 26, 2014, UIP emailed Gilbane with its first iteration of a full switchgear submittal – in this case for the larger switchgear located within standalone housing, as opposed to the smaller switchgear within the generators. Trial Ex. 44; Tr. at 39-40. UIP's switchgear submittal did not contemplate providing IEEE-compliant equipment. Instead, it contemplated using IEC-compliant switchgear as a substitute. Trial Ex. 44 at 3. Gilbane did not immediately send this submittal to the Navy for review because Gilbane believed certain corrections needed to be made. The evidence, on balance, reflects that these corrections were not related to IEEE compliance, as Gilbane was at that time still relying heavily on UIP's technical and contracting experience, and it had yet to hear of the Navy's rigidity with respect to IEEE.[5] Tr. at 41.

23. On March 3, 2014, Hogue and other Gilbane employees drafted a letter of concern to UIP noting the lack of progress on submittals for generators, switchgear, and transformers, all of which had lead times of six months or more. Trial Ex. 45; Tr. at 27-29. This letter of concern warned UIP that it would be responsible for costs arising from any delay, which at that point was estimated at one month. Gilbane demanded a corrective action plan by March 5, 2014.

24. On March 6, 2014, Gilbane forwarded the Navy a submittal for generators. Gilbane had gone through several rounds of edits on this submittal with UIP. The Navy rejected the

---

[4] Because the emails submitted as trial exhibits may have been time-stamped in different time zones, the dates of correspondence may occasionally be off by one day.
[5] Gilbane had its own technical staff and remained responsible for interfacing with the Navy even under the terms of the Subcontract. However, it appears to have taken a remarkably hands-off approach to its responsibilities at Camp Lemonnier, such that at most points up until termination it was apparently operating as little more than a middleman – and not a particularly effective middleman – between the subcontractor doing the actual work and the client paying for it.

submittal the following day, in part because the generator switchgear did not comply with IEEE standards.[6]  Trial Ex. 46.  Stephens was the Navy reviewer responsible for the rejection.

25.     On March 7, 2014, Mazin Sadiq responded to Gilbane's letter of concern with UIP's corrective action plan.  Trial Ex. 48 at 3-4; Tr. at 28-31.  Sadiq's letter reflected some regret that UIP had committed to meeting a December 2014 completion date even after the Subcontract's belated signing saddled UIP with delays Sadiq didn't feel responsible for.  However, the letter did not claim that UIP was contractually or otherwise legally entitled to delays for the late signing.  Instead, it blamed the delay primarily on Gilbane's failure to issue Requests for Information ("RFIs") and send submittals to the Navy in a timely fashion.  Trial Ex. 48 at 3-4.  Sadiq promised that UIP would meet its existing completion date by pushing ahead with the aspects of the generator submittal that the Navy had not objected to, notwithstanding the lack of formal approval.  UIP stated that this plan for recovery was conditional on Gilbane making the "milestone payment" on the generators on May 14, 2014.

26.     Sadiq attached UIP's "latest recovery plan" to his response.  Trial Ex. 48 at 8.  This recovery plan had not been updated since January 18, 2014, and therefore contained submittal deadlines that had already passed.  Tr. at 31-34.  The Court finds nothing deceptive about the recovery plan or the fact that Sadiq referred to it as UIP's most recent.  The plan's data date demonstrates that it was a version created in response to earlier delays in signing the Subcontract in January 2014 – and presumably the "latest" schedule then in existence.  However, the Court finds UIP's failure to revise its recovery plan in response to Gilbane's letter of concern indicative of a lack of diligence.

27.     On March 20, 2014, Hogue sent an email addressing the statements UIP made in its March 7 response to Gilbane's letter of concern.  Trial Ex. 62.  Specifically, Hogue expressed

---

[6] The Court finds no merit in UIP's argument that Gilbane's collaboration on a noncompliant submittal somehow waived its right to insist on compliant submittals.  There is no evidence that Gilbane misled UIP into thinking that IEC-compliant equipment would be acceptable in lieu of IEEE-compliant equipment.  If anything, UIP misled Gilbane by failing to disclose the recent trouble it had encountered with IEC-compliant equipment.

ongoing frustration about delays in the submittal process, and he refused to make the March 14 "milestone payment" on generators without an approval from the Navy. Tr. at 35-37.

28.     On March 22, 2014, UIP sent a revised submittal for the generators, including the small switchgear for the generators, to Gilbane. Trial Ex. 65. UIP's submittal reflected its belief that the specifications the Navy insisted on were not readily available in IEEE-compliant equipment. Gilbane sent this submittal back to UIP without forwarding it to the Navy because the submittal failed to comply with the IEEE standards the Navy had previously shown it was expecting. Tr. at 41-43.

29.     On March 23, 2014, Mazin Sadiq responded to Hogue's March 20 email. Sadiq committed to making generator-related purchases at UIP's own risk, and he requested a discussion regarding expediting Gilbane's payment for the generators to help UIP in its efforts to mitigate delay. Trial Ex. 67. On March 24, 2014, Hogue sent a letter to UIP agreeing to discussions about expediting payment, but also expressing concern about the continued deficiencies in generator submittals, including the problems with adherence to IEEE standards.

30.     On March 25, 2014, UIP provided Gilbane with an updated recovery plan. Trial Ex. 70; Tr. at 54-55, 283. This recovery plan projected a 19-day delay in completion and somewhat longer delays for a number of interim deadlines, including switchgear submittals. The recovery plan identified certain incomplete activities as already completed, even though they weren't. For example, the switchgear submittal was listed as complete as of March 5, approved by the Navy as of March 20, and subject to an outstanding purchase order – which Gilbane was then obligated to pay – as of March 25. Trial Ex. 70 at 4. In reality, Gilbane was still waiting for a switchgear submittal that complied with the Navy's specifications.

31.     On or about March 26, 2014, Stephens spoke with Gilbane and UIP by phone about UIP's concerns that IEEE-compliant equipment satisfying the Navy's specifications was commercially unavailable. Stephens disagreed with UIP and recommended two potential suppliers, Kinney and Powell. Trial Ex. 102. UIP contacted those and at least six other potential suppliers shortly thereafter.

32.    On April 2, 2014, Gilbane and UIP discussed the status of the generator submittal at their weekly meeting, and UIP stated that they expected a response from GE with a revised quotation for IEEE-compliant equipment by the following day.  Trial Ex. 75; Tr. at 45-46.

33.    On April 9, 2014, Gilbane and UIP again discussed the status of the generators at their weekly meeting.  Trial Ex. 78.  The meeting minutes, which UIP drafted, reflect that the Navy had approved breakout submittals for elements of the generators, but not for the switchgear.  The meeting minutes also reflect that a revised switchgear quotation was expected from GE April 10, 2014, and a full generator submittal was expected for approval by April 15, 2014.

34.    On April 13, 2014, UIP provided Gilbane with its last formal recovery plan.  Trial Ex. 82.  The data date for the recovery plan was March 31, 2014.  The new completion date under the recovery plan was January 15, 2015.  The generator submittal was to be completed and approved by April 3, 2014, with a purchase order placed by April 7.  The switchgear submittal was to be completed and approved by April 16, 2014, with a purchase order placed by April 21.

35.    On April 16, 2014, Gilbane and UIP had another weekly meeting, the minutes of which reflect that none of the previous week's deadlines – and none of the operative recovery plan's outstanding submittal deadlines – had been met.  Trial Ex. 87.

36.    On April 28, 2014, UIP received confirmation from Kinney's distributor that Kinney could meet the Navy's specifications.  Trial Ex. 90.  That confirmation came in the form of an email stating that Ebmeier, the "engineer of record" on the Navy's project specifications, was working for Kinney and "would be the lead [e]ngineer on this project."  *Id.*  Kinney did not offer any additional detail explaining its ability to meet the Navy's specifications.

37.    On May 4, 2014, Wail Sadiq prepared a draft claim (occasionally referred to in the record as a draft Request for Equitable Adjustment, or "REA") seeking a time extension due to the problems UIP was having locating a supplier that met all of the Navy's specifications.  Trial Ex. 657.  The draft claim expressed alarm at the appearance of impropriety in Kinney's relationship to the Navy.  Although a claim was not the proper mechanism for raising concerns of this kind, it was not unreasonable for UIP to be concerned about Kinney and the Navy.  As far as UIP was aware, it

had been presented with specifications that required it to patronize a single supplier – Kinney – charging significantly more than any of its competitors, for a product that was not widely available and that presented few or no practical advantages over the cheaper alternatives.  Kinney was one of just two suppliers personally recommended by the Navy reviewer enforcing the project's specifications, and the only one claiming full compliance with the Navy's specifications.  *See also* Tr. at 258.  Kinney had also recently hired an engineer who drafted those specifications when he was with the Navy, and that engineer was being held out by Kinney's distributor as the primary reason for doing business with it.  Trial Ex. 90.

38.     However, Gilbane never received UIP's draft claim.  On May 6, 2014, Wail Sadiq emailed Hogue to let him know that "drafts" would be arriving shortly.  Trial Ex. 90.  But Sadiq never sent them.  Tr. at 59.

39.     On May 8, Gilbane representatives met with UIP to discuss progress on the submittals.  Trial Ex. 474; Tr. at 177.  Notes taken by Gilbane's attorney at that meeting reflect that UIP raised its concerns about Kinney to those present.  The meeting notes also reflect that Davis told UIP that they could submit a request for a variation from the specifications if they wished, but that they first needed to supply a submittal as close as possible to the specifications, from which variations could then be requested.  Tr. at 179.  UIP was reluctant to do this because of the cost involved.  Tr. at 180.

40.     On May 10, Wail Sadiq sent Davis an email explaining how he intended to proceed with switchgear procurement despite the Navy's failure to specify the software it intended to use with its switchgear and generators.  Trial Ex. 96; Tr. at 181-82.  This is the first indication of several that programming was never – at least not during the period of importance to the parties – on the critical path for the Camp Lemonnier project.

41.     On May 14, 2014, Gilbane sent UIP a Request for Proposal regarding descoping its programming work.  Trial Ex. 99.  This was required because CAT-ISO owned the source code for the existing system and intended on fully integrating the generators itself.

42.     On May 16, 2014, Wail Sadiq sent Hogue a draft RFI reciting the difficulty UIP had encountered locating a supplier capable of providing IEEE-compliant equipment that met the Navy's specifications.  Trial Ex. 102.  The RFI also recited UIP's concerns about the relationship between Kinney and the Navy.  On May 19, Hogue responded to Wail Sadiq with an email declining to send the RFI to the Navy because he felt putting the Navy on notice of a delay would be "premature."  Trial Ex. 106.  Hogue's reasons for calling the RFI "premature" were flawed in part.  For example, Hogue stated that UIP had failed to completely vet the suppliers who had provided quotes, and he stated that UIP had failed to reach out to more than four or five new suppliers overall.  Although he may not have realized it at the time, both of these statements were incorrect.  Tr. at 121, 209-12.  However, Hogue did accurately note that UIP had failed to provide a complete submittal to be used as a basis for requesting variations, and had failed to provide a list of variations.  Tr. at 120-21.  Hogue also expressed concern about the consequences of sending unsubstantiated allegations of impropriety to the Navy.  Hogue's response was a reasonable approach given that: (i) there was no actual proof of impropriety; and (ii) it wasn't clear how UIP expected its allegations to positively impact the project schedule or what connection it saw between its allegations of an ethical breach and its demand for excusable delay.

43.     On May 18, 2014, Davis emailed Wail Sadiq to reiterate that the only condition to further discussions with the Navy was a formal request for variation, which necessarily required a complete submittal.  Trial Ex. 104; Tr. at 184.

44.     On May 19, 2014, Hogue sent an email to a fellow Gilbane employee stating that he expected UIP's termination to be "imminent," and ascribing UIP's problems to a "regional philosophy that everything is negotiable."  Trial Ex. 465.  Hogue also stated that he'd been in talks with PPI, another contractor, to fill in for UIP after termination.  Although UIP presents Hogue's discussions with PPI as evidence of a bad-faith effort to terminate UIP without giving it a fair chance to cure its delays, the Court finds Hogue's action on Gilbane's behalf to be a reasonable response to the risk of termination.  Indeed, if Gilbane had terminated UIP without making any

contingencies for an efficient transition to a replacement, it might fairly have been accused of failing to mitigate.

45.     On May 19, 2014, Gilbane sent its second letter of concern to UIP, reiterating largely the same series of concerns as in its first letter. Trial Ex. 107; Tr. at 66. Specifically, generator and switchgear submittals remained outstanding. This was a significant problem given the long lead time associated with both, which early purchase orders for certain elements of the generators had only partially alleviated.

46.     On May 19, 2014, Wail Sadiq received a "compliance report" from Kinney's distributor reflecting, in summary fashion, that Kinney would comply with all of the Navy's specifications. Trial Ex. 656. Sadiq responded the following day with a request for additional information, including previously requested "datasheets." *Id.*

47.     On May 22, 2014, UIP responded to the second letter of concern with a promise to provide a fully compliant generator submittal by May 27. Trial Ex. 110. UIP also committed to entering a conditional purchase order with Powercon for IEEE-compliant switchgear, and proposed a call with Stephens at NAVFAC to discuss variations. Tr. at 67-68. UIP did not provide a new recovery plan in response to the second letter of concern, but it did commit to having equipment installed or received by the initial December 4, 2014 completion date. Tr. at 392. According to prior recovery plans, this would then have left a testing and commissioning period that could have pushed the completion date at least into late January 2015. Hogue, apparently interpreting UIP as committing to meet the initial completion date in full, believed UIP was lying to him. Tr. at 69.

48.     On May 22, 2014, UIP responded to Gilbane's May 14 descoping letter with a proposal projecting added costs if hardware wasn't delivered by CAT-ISO by October 1, 2014. Trial Ex. 111. This is another indication that it was widely known that programming was not (at least at that moment and for some time thereafter) on the critical path for the Camp Lemonnier project. Tr. at 72.

49.     On May 28, 2014, Gilbane and UIP had a call with Stephens at NAVFAC as UIP had requested in its response to the second letter of concern. Tr. at 185-86, 251-53. The call was to

discuss the difficulty the parties were having with the Navy's specifications and the possibility of variations related to IEEE compliance and other issues. On the call, Stephens was unequivocal about the importance of meeting the IEEE paint requirement in particular. Tr. at 212.

50. Stephens admitted at trial that the fourth position indicator was an error in the specifications. However, there is no evidence and no reason to believe that Stephens informed Gilbane or UIP of the error in the specifications on his call with the parties or at any time prior to termination. Tr. at 406-07. Stephens testified that the fourth position indicator would not have been an obstacle to getting a submittal approved. Tr. at 254-55. But that does not mean it wouldn't have been an obstacle for a subcontractor or contractor attempting in good faith to comply with the Navy's specifications before presenting a submittal.

51. On June 3, 2014, Hogue emailed Mazin Sadiq to express his concern about UIP's decision to seek a conditional purchase order with Powell given that Powell couldn't meet the Navy's specifications for IEEE-compliant paint. Trial Ex. 516. Sadiq responded, with some frustration, that he was attempting to finalize with Powell in order to get a complete submittal and seek a variation. Trial Ex. 97; Tr. at 338-40. Sadiq's frustration was understandable given the somewhat mixed messages Gilbane was sending about its insistence on a submittal showing strict compliance on the one hand and its willingness to proceed with a variation on the other. However, given that Stephens had already made clear the importance of the IEEE paint specification, Hogue's email was an appropriate attempt to prevent UIP from wasting additional time and money on an option the Navy seemed certain to reject. Given that Kinney had already stated that it was prepared to comply with the IEEE paint specification – and all other specifications – UIP could reasonably have been expected to turn to Kinney.

52. On June 9, 2014, UIP sent Gilbane a submittal for generators that was deficient in several technical respects and returned for corrections. Trial Exs. 124, 134; Tr. at 186-90.

53. On June 12, 2014, Gilbane sent UIP a cure notice demanding that UIP address the items delayed as of the second letter of concern. Trial Ex. 128. Wail Sadiq was surprised to receive the cure notice because the only item from the second letter of concern that remained on the

project's critical path was the switchgear submittal. Tr. at 390. The Court finds that this is effectively an admission that the cure notice was justified by UIP's failure to address the outstanding switchgear submittal.

54.     On June 17, 2014, the Navy sent Gilbane a letter of concern noting that the Navy had not received a submittal for the switchgear, which was identified as a critical-path item with a long lead time. Trial Ex. 131. The Navy also noted that it hadn't received a complete submittal for the generators. The Navy expressed doubt about Gilbane's ability to meet its completion deadline, arousing concern at Gilbane that the Navy was preparing for termination. Tr. at 74-75. Although the Navy did not take any further steps to terminate Gilbane – even after much lengthier delays later in the project – termination was a reasonable concern at the time.

55.     On June 17, 2014, at a meeting between Gilbane and UIP, Mazin Sadiq stated that UIP wouldn't pay the 10% downpayment Kinney required to start the submittal process unless Gilbane or the Navy issued an approval beforehand. Trial Ex. 132. Sadiq was evidently concerned about the financial risk UIP would be exposed to if it proceeded with Kinney without having received the kind of technical detail it normally relied on to ensure its supplier would be capable of meeting the project's specifications.

56.     On June 22, 2014, several hours before the ten-day cure period expired, Gilbane sent UIP an email with a termination letter attached. Trial Ex. 137; Dkt. No. 140 at 2. The termination letter stated that termination was for default for failure to cure the deficiencies listed in the cure notice. These deficiencies included UIP's failure to meet submittal deadlines for generators, switchgear, and fuel systems; UIP's failure to meet delivery dates for equipment, which were listed as terms of the Subcontract; and UIP's failure to adhere to its own recovery plan. Gilbane's termination letter can reasonably be understood as a termination not just for untimely performance (a problem that terminating UIP couldn't have fixed at that point), but also for failure to perform with the diligence necessary to ensure timely and compliant performance. Tr. at 304-10, 322; *see also* 48 U.S.C. § 52.249-10(a).

57.     On June 22, 2014, just minutes after Gilbane's termination letter arrived, UIP sent its response to Gilbane's cure notice. UIP's response blamed Gilbane and the Navy for creating the project's delays. Trial Exs. 136, 481. Wail Sadiq has claimed that UIP's response to the cure notice addressed all of the issues raised in the notice. Tr. at 359-60. This is not accurate. UIP's response reflected that the generators and fuel system were no longer on the critical path. But taking those items off the critical path didn't mean that they were no longer delayed. It meant only that they weren't causing any greater delay than the switchgear issue UIP still hadn't resolved.

58.     On June 25, 2014, Gilbane received a quote from PPI that was $2 million higher than UIP's bid for the same work, and $3.5 million higher than PPI's initial bid. Trial Ex. 467, Tr. at 133.

59.     On August 21, 2014, Gilbane contracted with Kinney for switchgear without having done any further vetting of competing suppliers. Trial Ex. 153; Tr. at 127-28.

60.     On October 2, 2014, Gilbane's submittal for Kinney-supplied switchgear was approved by the Navy despite the fact that the Navy hadn't finalized its programming. Trial Ex. 167. This is further evidence that the critical path did not run through programming. *See also* Trial Ex. 167; Tr. at 101, 196-98.

61.     In January 2015, Gilbane sent the Navy an REA stating that it believed the Navy's failure to resolve its programming issue justified a 262-day extension for government-imposed delays beginning February 17, 2014. Trial Exs. 614; Tr. at 97-98. In connection with its REA, Gilbane submitted a time impact analysis supporting its view that programming was on the project's critical path. The data date on this time impact analysis was June 24, 2014 – two days after termination. Tr. at 491. Ultimately, Gilbane received a 71-day extension. Tr. at 99-100.

62.     The Camp Lemonnier project was still incomplete as of December 2016. Tr. at 87, 91.

<u>Factual Analysis</u>

63.     The Court finds that the critical path of the Camp Lemonnier project ran through switchgear procurement as of the date of termination. Based on UIP's last formal recovery schedule, UIP estimated that it would take 359 days to complete the Camp Lemonnier project from the date UIP began preparing its switchgear submittal. Trial Ex. 82. As UIP had not begun

working on a compliant switchgear submittal as of the date of termination on June 22, 2014, UIP's own recovery schedule – which can reasonably be assumed to reflect interim deadlines that UIP had already compressed – forecast the Camp Lemonnier project to be complete by June 16, 2015. That is a 194-day delay over the original December 4, 2014 completion date. UIP has not presented any credible evidence of a time extension that would excuse a delay of this magnitude. A Gilbane-produced time impact analysis contemporaneous with the termination is not necessary to confirm that UIP's delays were valid grounds for a default.

64. UIP is correct that if Gilbane's January 2015 REA were accurate as of the June 24, 2014 data date on its attached time impact analysis, UIP couldn't have been terminated solely for having missed its past deadlines.[7] But the programming evidence previously discussed demonstrates that Gilbane's time impact analysis and REA were both false, and that Gilbane could not reasonably have believed otherwise. Indeed, Hogue admitted at trial that Gilbane knew well before January 2015 that switchgear fabrication did not require programming information. Tr. at 101. UIP argues that this means Gilbane misled the Navy with its REA. But the Court has not been presented with evidence that UIP was injured – or its failure to perform somehow cured – by Gilbane's apparent misrepresentations to the Navy.

65. It is true that Gilbane could have ordered UIP to contract with Kinney or could have descoped UIP's switchgear work and reassumed responsibility for that portion of the Subcontract. Either of those approaches would have been a reasonable response to UIP's conduct and might have avoided a termination for default. However, the Court does not find termination for default unreasonable simply because other, lesser alternatives were available. It was reasonable for Gilbane to interpret UIP's deficient performance with respect to the standalone switchgear as indicative of its inability or unwillingness to perform in areas where noncritical deadlines were still

---

[7] UIP could still have been terminated for failing to prosecute its work with the diligence necessary to ensure timely and compliant performance. For the reasons discussed above, it was reasonable for Gilbane to believe that terminating UIP was necessary to remove an ongoing threat to performance – even if hiring a new subcontractor or reassuming responsibility for UIP's work wouldn't have been enough to get the Prime Contract entirely back on schedule.

outstanding – the full generator submittal, for example. There was also nothing in the Subcontract language or the provisions it incorporated that required Gilbane to exhaust all available alternatives before terminating UIP for default. Indeed, if Gilbane had adopted that approach, it might fairly have been accused of incurring costs that it could have mitigated if it had terminated sooner.

66.     UIP argues that it was entitled not to pursue a contract with Kinney because Kinney's lack of transparency on technical details gave UIP legitimate reason to doubt whether Kinney would be able to comply with the project's specifications. The Court does not believe that this was the reason for UIP's refusal to proceed with Kinney. The balance of the evidence reflects instead that UIP objected to the prospect of paying substantially more for a product that it hadn't expected and didn't believe it needed to supply. For example, there is scant evidence that UIP proactively reached out to Kinney for additional technical detail that might have helped it in assessing Kinney's abilities. This contrasts with the substantial evidence that UIP pursued lower-cost suppliers providing noncompliant equipment – a choice motivated at least in part by UIP's admitted financial stress. In essence, rather than attempting to lock down the more expensive supplier that had promised to meet the Navy's specifications, UIP was attempting to lock down a cheaper supplier that had promised not to. At trial, Wail Sadiq's explanation for this strategy was unconvincing. Tr. at 355. He stated that the Navy might have changed specifications after UIP entered a purchase order for Kinney, leaving UIP liable for a hefty downpayment. But if this was genuinely a risk, it was a risk common to any supplier that complied with the Navy's specifications, and not a reason for refusing to honor those specifications. Wail Sadiq also explained that he attempted to get additional data from Kinney's distributor, but that they refused to comply – responding with a blanket "yes" to UIP's requests for confirmation of technical compliance. Trial Ex. 656; Tr. at 382-83. But even if UIP had reason to be frustrated with Kinney's conduct, Kinney remained the only supplier that had promised to comply, so UIP could reasonably have been expected to keep pursuing Kinney (and with much greater diligence than UIP demonstrated). The Court shares UIP's concern that the Navy's rigid adherence to IEEE compliance may have imposed additional cost with little real benefit. But that is the specification UIP agreed to meet (or properly seek a variation from).

67.     UIP argues that Kinney's seemingly nefarious relationship with the Navy entitled UIP to decline its business.  As previously discussed, there may have been reasons for concern that Kinney's distributor – and perhaps even Kinney itself – was acting unethically.  However, the Subcontract did not entitle UIP to refuse its obligations to Gilbane simply because it felt a supplier was ethically unfit.  If there were reason to believe Kinney's distributor were acting illegally, that might have been grounds for excluding Kinney from the list of available suppliers.  But the record in no way supports an inference of that level of impropriety.

68.     The Court does not have enough evidence to reach a conclusion about whether Kinney was a de facto sole source.  There is some reason to believe it was.  The Court finds, for example, that UIP conducted an appropriate review of potential suppliers, as evidenced by the fact that Gilbane later relied on UIP's data to contract with Kinney without further vetting the alternatives.  The Court also finds that Stephens's speculation that other suppliers might have complied with the Camp Lemonnier specifications deserves little weight – particularly because it doesn't account for the erroneous fourth position indicator requirement, which Stephens did not remove from the specifications or alert the parties to.  Tr. at 257-59.  However, there is also reason to believe that UIP might have arrived at a fully compliant switchgear submittal by installing one supplier's compliant equipment into another supplier's compliant housing.  Tr. at 402-05.  It's not clear that the Navy would have accepted this, and the Court gives significant weight to Wail Sadiq's testimony in this regard.  Tr. at 405-06.  But it is clear that pursuing technical compliance was a more promising avenue for UIP – and far likelier to effect progress, even if the first submittal were rejected – than wasting valuable time pursuing noncompliance with specifications the Navy considered critical.

69.     Regardless of whether Kinney was a de facto sole source, the evidence before the Court does not demonstrate that a lack of alternative suppliers entitles UIP to the time delay it would need to avoid a termination for default for untimely performance.  If UIP's argument is that a lack of suppliers made it more time-consuming to arrive at a compliant submittal, its argument is undermined by the fact that, for most if not all of the period before termination, it wasn't genuinely trying to produce a compliant submittal.  Before March 7, 2014 – the date UIP was informed that

18

the Navy would reject IEEE-noncompliant equipment – UIP was not seeking out suppliers that met the Navy's specifications.  That period of delay is therefore entirely attributable to UIP's improper assumption that the Navy would accept IEC-compliant equipment.  After March 7, UIP was at least partially responsible for any additional delay because its ongoing efforts to pursue unworkable variations in lieu of IEEE compliance were squandering the time necessary to produce at a proper submittal.  This is particularly true from May 5, 2014 onward, as UIP evidently felt confident enough in Kinney's ability to comply with the Navy's specifications on that date that it drafted a claim referring to Kinney as a sole source.  Trial Ex. 657.  It may be that some delay would be justifiably attributable to a sole source problem.  But that delay pales in comparison to UIP's own role in failing to actively pursue IEEE compliance.

70.     The Court is also unconvinced by UIP's argument for excusable delays arising from the Navy's superior knowledge.  If any such delay existed, it existed only in the period after UIP realized IEC compliance wouldn't be accepted and before Stephens told UIP about Kinney.  That period was roughly March 7 to March 24, and is inconsequential.

71.     There is no merit to UIP's argument that the termination for default was invalid simply because Gilbane sent its termination letter slightly before the close of the ten-day cure period provided in the Federal Acquisition Regulations.  48 C.F.R. § 52.249-10(b)(2).  Nothing in UIP's response to Gilbane's cure notice, and nothing that UIP could have done in the hours that followed, could have prevented a termination for default.  Dkt. No. 140 at 2.

72.     At no point did UIP substantially comply with the Subcontract's requirements for submitting a claim.

<u>Additional Findings</u>

73.     On or about March 26, 2014, UIP submitted Payment Application No. 2 to Gilbane, in which UIP requested $2,329,166 for major equipment purchases.  Dkt. No. 193 at 15.  This money was to be split between $1,725,257 in generator equipment and $603,910 in fuel system equipment.  *Id.*; Trial Ex. 71; Tr. at 79-80.

74.     On April 18, 2014, Gilbane wired $2,329,166 directly to Faremco, UIP's supplier for generator equipment.  Dkt. No. 193 at 15.  This was an overpayment to Faremco in the amount of the fuel system payment, or $603,910.  *Id.*  UIP promptly notified Gilbane, Faremco, and UIP Lebanon of the overpayment to Faremco.  *Id.*

75.     On April 28, 2014, Faremco wired $603,910, the amount of the fuel system payment, to UIP.  Dkt. No. 112 at ¶ 44; Dkt. No. 120 at ¶ 44.[8]

76.     On April 29, 2014, Faremco wired $1,725,257, the amount of the generator payment Faremco was entitled to, to UIP Lebanon.  Dkt. No. 193 at 15.  UIP Lebanon later wired $1,500,000 back to Faremco.  *Id.*

77.     UIP later wired $180,000 to Arad Contracting, LLC, and $21,090 to Industrial and Environmental Solutions, Inc. for advances on major equipment purchases.  Dkt. No. 112 at ¶¶ 47, 48; Dkt. No. 120 at ¶¶ 47, 48.

78.     After UIP was terminated, Gilbane ratified or novated some of the purchase orders and subcontract agreements UIP had previously entered.  Tr. at 84-85.  This included the generator purchase order with Faremco.  Tr. at 135; *see also* Dkt. No. 206-1.

79.     Gilbane incurred in $14,542,605 in subcontractor and supplier costs to complete UIP's scope of work.  Dkt. No. 206-1 at ¶¶ 12-27; Dkt. No. 206-5; Dkt. Nos. 206-8 to 206-18; Dkt. Nos. 206-21 to 206-25; Dkt. No. 206-34 at ¶ 8; Dkt. No. 206-39 at 3-4.

80.     Gilbane incurred $161,912 in salaried labor and project management costs connected with reprocurement.  Dkt. No. 206-26 at ¶¶ 5-8; Dkt. Nos. 206-27, 206-29, 206-31, 206-33.  Gilbane's rates for salaried labor accurately reflect its actual costs.  Dkt. No. 193 at 15; *see* also Dkt. No. 56-42.

81.     Under Attachment C to the Subcontract, Gilbane is entitled to a markup for overhead in the amount of 10% and profit in the amount of 10% ($1,470,451 each, or $2,940,902 total).  Trial Ex. 34 at 45.

---

[8] Although the operative complaint lists the date as April 28, 2015, and UIP's answer admits that allegation, the reference to 2015 is clearly a typographical error.  *See, e.g.*, Dkt. No. 220 at 40; Tr. at 414-15.

82.     The remaining Subcontract balance at the time of termination was $8,206,793.  Dkt. No. 206-1 at ¶ 28; Dkt. No. 206-6.

83.     Gilbane collected $1,109,842 on UIP's bank guarantee.  Dkt. No. 193 at 16.

84.     The sum of reprocurement-related costs, overhead, and profit ($17,645,419), less the subcontract balance and bank guarantee ($9,316,635), is $8,328,784.  Gilbane is entitled to default-related damages in this amount.

85.     Gilbane has claimed $73,722.80 in attorneys' fees resulting from "UIP and UIP Lebanon's concerted legal actions in Lebanon" in violation of the Subcontract's forum-selection clause.  Dkt. No. 220 at ¶ 194; *see also* Dkt. No. 193 at 15.  Gilbane has claimed $12,000 in attorneys' fees from UIP and UIP Djibouti's threats of legal action in Djibouti.  *Id.* at ¶ 195.  The Court finds that Gilbane paid for legal services in those amounts.  *See* Dkt. Nos. 206-35 to 206-38. As to the fees incurred in Lebanon, the Court also finds that fees were incurred reasonably and in response to a violation of the forum-selection clause, which the lower-tier UIP subcontractors were bound by.[9]  *See* Dkt. No. 38; Dkt. No. 193 at 15; Dkt. No. 206-35.  However, as to the fees incurred in Djibouti, where no action was actually filed, the Court is unable to make any finding on breach or damages on the evidence before it.  Dkt. No. 206-36.

## II.     Conclusions of law

### Termination for default

1.     California law governs the Subcontract except to the extent federal procurement law governs.  Trial Ex. 34 at 54.  Federal procurement law governs the conditions for termination.  *See* 48 C.F.R. § 52.249-10.

2.     Gilbane bears the burden of proving that termination was justified by a preponderance of the evidence.  *See Lisbon Contractors, Inc. v. United States*, 828 F.2d 759, 765 (Fed. Cir. 1987).

3.     Gilbane was entitled to terminate for default if it reasonably believed that UIP could not complete the Camp Lemonnier project by the properly adjusted completion date.  *McDonnell*

---

[9] Gilbane's claim for attorneys' fees also appears to be less than the amount of liquidated damages it would have been entitled to under section 13 of Attachment C to the Subcontract.  Trial Ex. 34 at 49.

*Douglas Corp. v. United States*, 323 F.3d 1006, 1016 (Fed. Cir. 2003). This is an objective inquiry, and may take into account the parties' explanations for their conduct, a comparison of the work completed to the work remaining, past failure to meet milestones, problems with suppliers, performance history, and financial status. *Id.* at 1016-17.

    4.    In light of the Court's factual findings, Gilbane has demonstrated by a preponderance of the evidence that UIP breached its Subcontract with Gilbane. Gilbane has also demonstrated that the resulting termination for default was justified, both due to UIP's inability to provide timely performance and its refusal or inability to perform its work with the necessary diligence. 48 C.F.R. § 52.249-10(a); *see also CJP Contractors, Inc. v. United States*, 45 Fed. Cl. 343, 371 (1999). All of the factors described in *McDonnell Douglas* weigh in Gilbane's favor. Although it is undisputed that UIP performed its work with technical competence, the evidence amply demonstrates that UIP was unable to set and adhere to its own deadlines and, where it found them too burdensome, unwilling to adhere to the project specifications it had agreed to. *Cf. Aptus Co. v. United States*, 61 Fed. Cl. 638, 647-48 (2004). UIP repeatedly promised to recover from the delays caused by its failure to make progress on the switchgear. However, as of the date of termination, UIP had not given any indication that it was committed to or capable of honoring those promises, and its justifications for its continued failure to perform were inadequate. UIP had missed all of its internal deadlines for providing switchgear submittals, and its discussions with Gilbane demonstrated an ongoing aversion to either a fully compliant submittal or a variation with a realistic likelihood of success. UIP's arguments against default and in favor of termination for convenience are not meritorious. UIP's delays were not excusable, and UIP was not entitled to any time extension that would have come close to curing its delays.

    5.    Gilbane is entitled to default-related damages from UIP in the amount of $8,328,784.

Conversion and civil conspiracy

    6.    California law applies to Gilbane's extra-contractual claims because California's choice-of-law rules, which govern this Court's choice-of-law analysis, provide that a forum will generally "apply its own rule of decision unless a party litigant timely invokes the law of a foreign

state." *Wash. Mut. Bank, FA v. Superior Court*, 24 Cal. 4th 906, 919 (2001). No party has done so here.

7.    The elements of conversion under California law are (1) the plaintiff's ownership or right to possession of the property, (2) the defendant's conversion by a wrongful act or disposition of property rights, and (3) damages. *Lee v. Hanley*, 61 Cal. 4th 1225, 1240 (2015).

8.    The elements of a civil conspiracy under California law are (1) formation and operation of the conspiracy, (2) an act done in furtherance of the common design, and (3) damage resulting to the plaintiff. *Thompson v. Cal. Fair Plan Ass'n*, 221 Cal. App. 3d 760, 767 (1990).

9.    Gilbane is not entitled to actual damages for conversion or for civil conspiracy because the money it seeks to recover is already reflected in the reduced contract balance used when calculating its total contract damages. Dkt. No. 206-1 at ¶¶ 28-29. Gilbane cannot recover twice for the same injury. *Plotnik v. Meihaus*, 208 Cal. App. 4th 1590, 1611-12 (2012).

10.   Assuming for argument's sake that the elements of conversion or civil conspiracy are met, Gilbane is not entitled to punitive damages because UIP was not guilty of "oppression, fraud, or malice." Cal. Civ. Code § 3294(a), (c).

Violation of the forum-selection clause

11.   UIP Lebanon violated the Subcontract's forum-selection clause by bringing an action against Gilbane in Lebanon. Gilbane is entitled to the $73,722.80 in Lebanese attorneys' fees it reasonably incurred as a result.

12.   Gilbane has not demonstrated that UIP Djibouti violated the forum-selection clause.

**IT IS SO ORDERED.**

Dated:  August 11, 2017

_____
VINCE CHHABRIA
United States District Judge